UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------- X
                      :

GAMCO INVESTORS, INC.,          :

                      :

                 Plaintiff,   :

                      :

         v.             :

                      :

VIVENDI, S.A. (sued as VIVENDI   :
UNIVERSAL, S.A.),          :

                      :

               Defendant.  :
----------------------------------------------------
GAMCO GLOBAL SERIES FUNDS,   :
INC., GABELLI CAPITAL ASSET   :
FUND, THE GABELLI VALUE FUND, :
INC., THE GABELLI ASSET FUND,  :
THE GAMCO MATHERS FUND, THE :
GABELLI GLOBAL MULTIMEDIA   :
TRUST, INC., THE GABELLI EQUITY :
TRUST, INC., THE GABELLI      :
CONVERTIBLE AND INCOME     :
SECURITIES FUND, INC., AND    :
GAMCO INTERNATIONAL GROWTH :
FUND, INC.,              :

                      :

                 Plaintiffs,  :

                      :

         v.            :

                      :

VIVENDI, S.A.,             :

                      :

               Defendant.  :

                      :
------------------------------------------------------- X

SHIRA A. SCHEINDLIN, U.S.D.J.:

**OPINION AND ORDER**

03 Civ. 5911 (SAS)

09 Civ. 7962 (SAS)

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 1/10/13

## I.   INTRODUCTION[1]

This Court's prior holdings establish that: (1) Vivendi Universal, S.A. ("Vivendi") is precluded from contesting the elements of a Section 10(b) claim, save for reliance; (2) GAMCO Investors, Inc. ("GAMCO") is entitled to the fraud on the market presumption, which shifts the burden to Vivendi to disprove reliance; and (3) Vivendi is precluded from raising the truth on the market defense to rebut the presumption of reliance.  Based on these holdings, plaintiff GAMCO moves for summary judgment on its Section 10(b) claim against Vivendi on the grounds that discovery is complete, and no facts exist which disprove reliance.[2] Vivendi opposes the motion.  For the following reasons, the motion is denied.

## II.   FACTS[3]

---

[1]   Familiarity with the extensive factual and legal background of this litigation is presumed.  *See In re Vivendi Universal, S.A. Sec. Litig.* ("Feb. 17 Op."), 765 F. Supp. 2d 512 (S.D.N.Y. 2011).  Only facts pertinent to this motion will be recited.

[2]   *See* Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment Against Defendant Vivendi, S.A. at 1-2.

[3]   The following facts are drawn from GAMCO's Statement Under Rule 56.1 in Support of Plaintiff's Motion for Summary Judgment Against Defendant Vivendi, S.A. ("56.1 Statement") and Defendant Vivendi, S.A.'s Response to Plaintiff GAMCO Investors, Inc.'s Statement Under Rule 56.1 in Support of Its Motion for Summary Judgment Against Defendant Vivendi, S.A. and Statement of Additional Facts Pursuant to Local Rule 56.1 ("56.1 Counter-statement").  The material facts are not in dispute for the purposes of this motion.  Both the 56.1 Statement and the 56.1 Counter-statement are supported by citations to evidence

On July 15, 2009, GAMCO filed an Amended Complaint alleging that Vivendi had violated Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") with respect to GAMCO's transaction in Vivendi's American Depositary Receipts ("ADRs"), which traded on the New York Stock Exchange during the period October 30, 2000 through August 14, 2002 (the "Class Period").[4]

On January 29, 2012, the jury in the class action *In re Vivendi Universal S.A. Securities Litigation*[5] (the "Class Action") returned its verdict, finding that Vivendi acted recklessly with respect to fifty-seven misstatements that "misstated or omitted Vivendi's true liquidity risk."[6]  On February 17, 2011, the Court entered a Memorandum Opinion and Order denying Vivendi's post-trial motion for judgment as a matter of law as well as class plaintiffs' motion for entry of final judgment.[7]  The Court stated that "Vivendi is entitled to rebut the presumption of reliance on an individual basis[,]" and that "any attempt to rebut the presumption of reliance on such grounds would call for separate inquiries into

admissible at trial.  These citations are omitted.

[4]     *See* 56.1 Statement ¶ 1.

[5]     No. 02 Civ. 5771 (S.D.N.Y).

[6]     56.1 Counter-statement at 2.  *See* 56.1 Statement ¶ 3.

[7]     *See* Feb. 17. Op., 765 F. Supp. 2d 512.  However, the Court granted Vivendi's motion for judgment as a matter of law as to one of the fifty-seven statements, statement number fifty-five.  *See id*. at 544.

the individual circumstances of the class members."[8]  Finally, on August 10, 2012,

the Court entered an Opinion and Order collaterally estopping Vivendi from

contesting, as to GAMCO, the Section 10(b) elements of falsity, materiality,

scienter, and loss causation, and from raising the truth on the market defense to the

presumption of reliance.[9]

Vivendi sets forth the following additional facts relevant to its

opposition.  GAMCO, a wholly owned subsidiary of Gabelli Asset Management,

Inc. ("GBL"), is an investment advisor with a broad spectrum of clients.[10]  The

research arm of GBL, Gabelli & Company, performs research for GAMCO and

other parts of GBL.[11]  GBL's chairman and CEO is Mario Gabelli.[12]

GBL held daily morning meetings during which Gabelli & Company

securities analysts presented research on the companies they covered to portfolio

managers, client salesmen and client service representatives from GAMCO and

_____

[8]      *Id*. at 584-85.

[9]      *See* 56.1 Statement ¶ 5 (citing *In re Vivendi Universal, S.A. Securities Litigation*, No. 02 Civ. 5571, — F. Supp. 2d —, 2012 WL 3264382, at *3 (S.D.N.Y. Aug. 10, 2012)).  *See In re Vivendi Universal, S.A. Secs. Litig.*, 2012 WL 3264382, at *4 ("Accordingly, collateral estoppel is granted for GAMCO Investors, Inc. to the same extent as granted to the Individual Plaintiffs.").

[10]     *See* 56.1 Counter-statement ¶ 1.

[11]     *See id.* ¶ 3.

[12]     *See id.* ¶ 4.

other fund subsidiaries.[13]  During these meetings, GBL employees discussed

investment ideas.[14]  GBL's portfolio managers decided which securities to buy and

sell on the basis of research provided by Gabelli & Company analysts.[15]

Vivendi presents evidence that GBL's portfolio managers

corresponded and/or met with Vivendi management, including Vivendi's CEO

Jean-Marie Messier, on multiple occasions during the relevant period.[16]

Specifically, Vivendi cites to the December 26, 2006 deposition of Caesar Bryan, a

portfolio manager at GBL, and to the June 8, 2007 deposition of Mario Gabelli.

Bryan states in his deposition that: "I've met with management of Vivendi on a

number of occasions in which [sic]  –  over the past years."[17]  When asked whom

he meant by "management," Bryan responded: "I mean, I have no recollection, but

I visited Vivendi and I've heard presentations made by Vivendi management over

---

[13]        *See id.* ¶ 5.

[14]        *See id.* ¶ 6.

[15]        *See id.* ¶ 7.

[16]        *See id.* ¶ 10 (citing 12/26/06 Deposition of Caesar Bryan (portfolio manager at GBL) ("Bryan Dep."), Ex. 8 to Declaration of Daniel Slifkin in Support of Defendant Vivendi, S.A's Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment Against Defendant Vivendi, S.A. ("Slifkin Decl."), at 88:3-10; 6/8/7 Deposition of Mario Gabelli (GBL Chairman and CEO) ("6/8/07 Gabelli Dep."), Ex. 2 to Slifkin Decl., at 106:5-13).

[17]        Bryan Dep. at 88-8:10.

the years."[18]   The relevant portion of Gabelli's deposition is quoted below:

> Q. Have you ever met or corresponded with Jean-Marie Messier?
> A. Yes.
> Q. Did you meet with Jean Marie Messier during the relevant time period?
> A. Maybe.
> Q. Did you correspond with Messier during the relevant time period?
> A. Maybe.
> Q. Do you have any recollection of a specific conversation you had with Jean-Marie Messier during the relevant time period?
> A. No.[19]

Furthermore, GAMCO employees occasionally participated in public Vivendi conference calls.[20]   Andrew Rittenberry was the Gabelli & Company analyst responsible for following Vivendi during the Class Period.[21]   In addition to following Vivendi, Rittenberry followed "all cable, media, and leisure companies."[22]

Vivendi presents evidence that the only valuation metric used by GAMCO in connection with trading Vivendi was "private market value"

---

[18]   *Id*. at 88:14-16.

[19]   6/8/7 Gabelli Dep. at 106:5-17.

[20]   *See* 56.1 Counter-statement ¶ 11.

[21]   *See id*. ¶ 8.

[22]   *Id*. ¶ 9.

("PMV").[23]  PMV is the amount that an informed industrialist would pay for a company's assets in a private-market transaction.[24]  To determine the PMV of a company, Gabelli & Company used a spreadsheet to value each segment of the company as if it were an independent operation, and then added the value of the various segments to arrive at a total.[25]  Vivendi contends that the market price of a security is not one of the factors used in calculating PMV, but this is contested by GAMCO.[26]  In deciding whether to recommend a trade, the analysts' main consideration is the difference between the PMV of the stock and its market price.[27]  GAMCO's investment strategy was to purchase securities trading at a price below their PMV, in the expectation that the market price of the securities would eventually rise.[28]

## III.   SUMMARY JUDGMENT STANDARD

"Summary judgment is designed to pierce the pleadings to flush out

---

[23]     *See id.* ¶ 12.

[24]     *See id.* ¶ 13.

[25]     *See id.* ¶ 14.

[26]     *Compare id.* ¶ 15 *with* Reply Memorandum of Law in Further Support of Plaintiff's Motion for Summary Judgment Against Defendant Vivendi, S.A. ("Reply Mem.") at 10.

[27]     *See* 56.1 Counter-statement ¶ 16.

[28]     *See id.* ¶ 17.

those cases that are predestined to result in a directed verdict."[29]  Thus, summary

judgment is only appropriate "if the pleadings, the discovery and disclosure

materials on file, and any affidavits show that there is no genuine issue as to any

material fact and that the movant is entitled to judgment as a matter of law."[30]  "For

summary judgment  purposes, a 'genuine issue' exists where the evidence is such

that a reasonable jury could decide in the non-moving party's favor."[31]  "'A fact is

material when it might affect the outcome of the suit under governing law.'"[32]

"[T]he burden of demonstrating that no material fact exists lies with the moving

party . . . ."[33]

        In a summary judgment setting, "[t]he burden is on the moving party

to demonstrate that no genuine issue respecting any material fact exists."[34]  "When

---

[29]     *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 907 (2d Cir. 1997).

[30]     Fed. R. Civ. P. 56(c).

[31]     *Sanchez v. Connecticut Natural Gas Co.*, 421 Fed. App'x 33, 34 (2d Cir. 2011) (quoting *Nabisco, Inc. v. Warner–Lambert Co.*, 220 F.3d 43, 45 (2d Cir. 2000)).

[32]     *Carter v. Incorporated Vill. of Ocean Beach*, 415 Fed. App'x 290, 292 (2d Cir. 2011) (quoting *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007)).

[33]     *Miner v. Clinton County, N.Y.*, 541 F.3d 464, 471 (2d Cir. 2008) (citation omitted).

[34]     *Mavrommatis v. Carey Limousine Westchester, Inc.*, No. 10 Civ. 3404, 2011 WL 3903429, at *1 (2d Cir. Sept. 7, 2011) (citing *Gallo v. Prudential*

the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence . . . on an essential element of the nonmovant's claim."[35]  In turn, to defeat a motion for summary judgment, the non-moving party must raise a genuine issue of material fact.[36]  The non-moving party "'must do more than simply show that there is some metaphysical doubt as to the material facts,'"[37] and cannot "'rely on conclusory allegations or unsubstantiated speculation.'"[38]

In deciding a motion for summary judgment, a court must "'construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant.'"[39]  However, "'[c]redibility determinations, the weighing of the evidence, and the drawing of

---

*Residential Servs., L.P.*, 22 F.3d 1219, 1223 (2d Cir. 1994)).

[35]     *Cordiano v. Metacon Gun Club, Inc.*, 575 F.3d 199, 204 (2d Cir. 2009).

[36]     *See id.*

[37]     *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

[38]     *Id.* (quoting *Federal Deposit Ins. Corp. v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010)).

[39]     *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quoting *Williams v. R.H. Donnelley Corp.*, 368 F.3d 123, 126 (2d Cir. 2004)).

legitimate inferences from the facts are jury functions, not those of a judge.'"[40]
"'The role of the court is not to resolve disputed issues of fact but to assess
whether there are any factual issues to be tried.'"[41]

## IV. APPLICABLE LAW

### A. Section 10(b) of the Securities Exchange Act and Rule 10b-5

Section 10(b) of the Exchange Act makes it illegal to "use or employ,
in connection with the purchase or sale of any security . . . any manipulative or
deceptive device or contrivance in contravention of such rules and regulations as
the Commission may prescribe . . . ."[42]  Under Rule 10b-5, promulgated under
Section 10(b), one may not "make any untrue statement of a material fact or [] omit
to state a material fact necessary in order to make the statements made, in the light
of the circumstances under which they were made, not misleading . . . in
connection with the purchase or sale of any security."[43]  "To sustain a private claim
for securities fraud under Section 10(b), 'a plaintiff must prove (1) a material

---

[40]     *Kaytor v. Electric Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010)
(quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000))
(emphasis removed).

[41]     *Brod*, 653 F.3d at 164 (quoting *Wilson v. Northwestern Mut. Ins. Co.*,
625 F.3d 54, 60 (2d Cir. 2010)).

[42]     15 U.S.C. § 78j(b).

[43]     17 C.F.R. § 240.10b-5.

misrepresentation or omission by the defendant; (2) scienter; (3) a connection

between the misrepresentation or omission and the purchase or sale of a security;

(4) reliance upon the misrepresentation or omission; (5) economic loss; and (6)

loss causation.'"[44]

### 1.    Reliance

The reliance and loss causation elements of a securities fraud claim

are analogous to but-for and proximate causation, respectively.[45]  To prove

reliance, the plaintiff must show that but for the material misleading statement or

omission, he would not have transacted in the security.  "The traditional (and most

direct) way a plaintiff can demonstrate reliance is by showing that he was aware of

a company's statement and engaged in a relevant transaction— *e.g.*, purchasing

common stock—based on that specific misrepresentation."[46]

Additionally, the plaintiff must show that his reliance was

---

[44]    *Ashland Inc. v. Morgan Stanley & Co., Inc.*, 652 F.3d 333, 337 (2d
Cir. 2011) (quoting *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552
U.S. 148, 157 (2008)).  *Accord Erica P. John Fund, Inc. v. Halliburton Co.*, —
U.S. — , 131 S.Ct. 2179, 2184 (2011).

[45]    *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 106 (2d
Cir. 2007).

[46]    *Erica P. John Fund, Inc.*, 131 S.Ct. at 2185.

reasonable.[47]  "An investor may not justifiably rely on a misrepresentation if,

through minimal diligence, the investor should have discovered the truth.  Under

this standard, § 10(b) liability will not be imposed when an investor's conduct rises

to the level of recklessness."[48]  The Second Circuit has not issued a definitive list

of factors that weigh on the reasonableness of reliance, but it has provided the

following list of relevant factors (the "*Brown* factors"):

> (1) The sophistication and expertise of the plaintiff in financial
> and securities matters; (2) the existence of longstanding business
> or personal relationships; (3) access to the relevant information;
> (4) the existence of a fiduciary relationship; (5) concealment of
> the fraud; (6) the opportunity to detect the fraud; (7) whether the
> plaintiff initiated the stock transaction or sought to expedite the
> transaction; and (8) the generality or specificity of the
> misrepresentations.[49]

### a.        The Fraud on the Market Presumption

In *Basic v. Levinson*, the Supreme Court held that, under certain

circumstances, a plaintiff is entitled to a rebuttable presumption (the "fraud on the

market presumption") that she relied on the integrity of the market price of a

---

[47]        *See Starr ex rel. Estate of Sampson v. Georgeson Shareholder, Inc.*,
412 F.3d 103, 109-10 (2d Cir. 2005) (affirming dismissal of Rule 10b-5 claim
where reliance on the alleged material misstatements was unreasonable given that
corrective information was available to a minimally diligent investor).

[48]        *Brown v. E.F. Hutton Group, Inc.*, 991 F.2d 1020, 1031-32 (2d Cir.
1993) (internal citation omitted).

[49]        *Id*. (citations omitted).

security.[50]  Specifically, the Court held that an investor who bought stock at market price may avail herself of the presumption that she "relied on the integrity of the price set by the market" if the market is efficient.[51]  The Court reasoned that "[b]ecause most publicly available information is reflected in [the] market price, an investor's reliance on any public material misrepresentations, therefore, may be presumed for purposes of a Rule 10b-5 action."[52]  As long as the "plaintiffs can show that the alleged misrepresentation was *material* and publicly transmitted into a well-developed market, then reliance will be presumed . . . ."[53]  *Basic*'s holding obviated the need for a securities fraud plaintiff to show that she personally was aware of, and relied on, the alleged material misrepresentation.[54]

In short, "[t]he . . . fraud-on-the-market theory involves two rebuttable presumptions that permit a finding of . . . reliance . . .: 'that (1) misrepresentations

---

[50]     485 U.S. 224, 247 (1988).

[51]     *Id.* at 227.

[52]     *Id.* at 247.  *Accord Hevesi v. Citigroup Inc.*, 366 F.3d 70, 77 (2d Cir. 2004).

[53]     *In re Salomon Analyst Metromedia Litig.*, 544 F.3d 474, 483 (2d Cir. 2008) (emphasis added).

[54]     *See Erica P. John Fund, Inc.*, 131 S.Ct. at 2185 (noting that the holding of *Basic* was made in response to the evidentiary issues posed by modern impersonal markets, as well as the difficulty of class certification where direct proof of reliance was required).

by an issuer affect the price of securities traded in the open market, and (2) investors rely on the market price of securities as an accurate measure of their intrinsic value.'"[55]  As such, "[a]ny showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or [her] decision to trade at a fair market price, will be sufficient to rebut the presumption of reliance."[56]

One way to "sever the link" is to demonstrate that the alleged misrepresentation did not impact the market price.  For example, a defendant could show that the misstatement was known to be false by market makers,[57] or that a statement correcting the misrepresentation was made to, and digested by, the market.[58]  Another way to sever the link is to show that the investor did not "rely on the market price of [the] securit[y] as an accurate measure of [its] intrinsic value."[59]  For example, a plaintiff who transacts in a security despite having

---

[55]    *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 200 n.4 (2d Cir. 2008) (quoting *Hevesi*, 366 F.3d at 77).

[56]    *Basic*, 485 U.S. at 248-49.

[57]    *See id.* at 248.

[58]    *See id*.

[59]    *Teamsters Local 445 Freight Div. Pension Fund*, 546 F.3d at 200 n.4 (quotation marks omitted).  *Accord In re Harcourt Brace Jovanovich, Inc. Secs. Litig.*, 838 F. Supp. 109, 114 (S.D.N.Y. 1993) (stating "[i]t is axiomatic under *Basic* that non-reliance on the integrity of the market is critical in rebutting the

knowledge of the fraud cannot prove reliance.[60]

## V.    DISCUSSION

In opposing summary judgment, Vivendi argues that a reasonable jury could find that it has rebutted the fraud on the market presumption by finding that: (1) GAMCO's reliance was unreasonable because it either had, or should have had, reason to doubt Vivendi's public statements;[61] (2) GAMCO would have purchased Vivendi securities even if it had known of the fraud;[62] or (3) GAMCO did not rely

---

presumption of reliance in a fraud on the market case[,]" and holding that defendants were entitled to discovery of plaintiff's investment history, despite plaintiff's reliance on fraud on the market theory of reliance).

[60]    *See Basic*, 485 U.S. at 249 ("Petitioners also could rebut the presumption of reliance as to plaintiffs who would have divested themselves of their Basic shares without relying on the integrity of the market."). *See also Stark Trading v. Falconbridge Ltd.*, 552 F.3d 568, 572 (7th Cir. 2009) (holding that sophisticated minority shareholders who tendered their shares in merger, despite knowing of fraud perpetrated by majority shareholder to artificially depress the share price, could not establish reliance).

[61]    *See* Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment Against Defendant Vivendi, S.A. ("Opp. Mem.") at 15 ("A jury could find that GAMCO's reliance was unreasonable either because GAMCO learned information during meetings or conference calls or from its own research that undermined Vivendi's public statements, or because given what GAMCO knew from its research and experience, it should have asked questions that would have led to the truth.").

[62]    *See id.* at 10 ("[I]f Vivendi presents evidence that creates a genuine issue of material fact regarding whether GAMCO would have nonetheless purchased Vivendi stock even if it had known of the alleged fraud, summary judgment must be denied.").

on the integrity of the market.[63]   I will address each argument in turn.

### A.   Vivendi Has Raised a Material Question of Fact With Respect to the Reasonableness of GAMCO's Reliance

In this Circuit, "a plaintiff's reliance on the defendant's

misrepresentation must have been reasonable in order for the claim to proceed."[64]

The reasonableness inquiry is straightforward when the plaintiff seeks to establish

reliance directly.[65]   When a securities fraud claim is defeated for lack of reasonable

reliance, the typical pattern is that the plaintiff had access to information which

rendered reliance on the allegedly material misstatement unreasonable.  In essence,

then, the "reasonableness" prong of reliance merely recognizes that a plaintiff

cannot willfully blind herself to a known risk.

When the plaintiff seeks to prove reliance through fraud on the

market, this reasonableness inquiry applies only to the extent that corrective

---

[63]     *See id*. at 14 ("Given GAMCO's investment philosophy, a reasonable jury could find that GAMCO did not rely on the integrity of the market in making its purchase decisions, which would rebut the presumption of reliance and allow the jury to find in favor of Vivendi.").

[64]     *Ashland Inc. v. Morgan Stanley & Co., Inc.*,  652 F.3d 333, 337-38 (2d Cir. 2011) (citing *Harsco Corp. v. Segui*, 91 F.3d 337, 342 (2d Cir. 1996)).

[65]     *See, e.g., Hunt v. Alliance North Am. Gov't Income Trust, Inc.*, 159 F.3d 723, 730 (2d Cir. 1998) (affirming dismissal of securities fraud claim when minimal diligence would have revealed to plaintiffs that total reliance on challenged brochures was unreasonable).

information was known either to the plaintiff or to the market.[66]  Fraud on the

market entails reliance on the market price of a security, which fluctuates as the

market incorporates the material misstatement or omission.  Excepting cases of

non-public information, it is hard to picture a circumstance where it would be

*unreasonable* for a plaintiff to rely on the price of a security traded in an efficient

market.[67]

A condition precedent to the fraud on the market presumption is that

the misrepresentation was material, *i.e.*, that it would be expected to alter the price

of the security.  Defendants can therefore rebut this presumption by showing that

the price was not affected by the misstatement or omission.[68]  One way of doing

---

[66]     *Cf. Maverick Fund, L.D.C. v. Comverse Tech., Inc.*, 801 F. Supp. 2d
41, 56 (E.D.N.Y. 2011) ("Purchasing at the price set by an efficient market not
only establishes reliance, but also that the reliance was reasonable.").

[67]     *See Basic,* 485 U.S. at 246-47 ("'[I]t is hard to imagine that there ever
is a buyer or seller who does not rely on market integrity. Who would knowingly
roll the dice in a crooked crap game?'") (quoting *Schlanger v. Four-Phase Sys.
Inc.*, 555 F. Supp. 535, 538 (S.D.N.Y. 1982)).  *See also In re Oxford Health Plans,
Inc., Sec. Litig.*, 191 F.R.D. 369, 376 (S.D.N.Y. 2000) ("No purchaser of securities
regardless of trading methodology or strategy would knowingly trade where
material information has been misstated or withheld by an issuer.").

[68]     *See In re Salomon Analyst Metromedia Litig.*, 544 F.3d at 483
("[P]laintiffs do not bear the burden of showing an impact on price. The point of
*Basic* is that an effect on market price is presumed based on the materiality of the
information and a well-developed market's ability to readily incorporate that
information into the price of securities.").

this is by showing that the falsity of the misrepresentation was already known to

market makers, and, as such, the misrepresentation could not have been material.[69]

This is known as the "truth on the market" corollary to fraud on the market,[70] and it

is one form in which the "reasonable reliance" test survives under the fraud on the

market presumption.  The reasonable reliance test holds that the plaintiff cannot

blind herself to a known risk, while the truth on the market defense assumes that

known risks are priced into the market.

Vivendi is precluded from contesting the materiality of its

misstatements by using the truth on the market defense to rebut the fraud on the

market presumption.[71]  And, not surprisingly, Vivendi cites no case holding that a

plaintiff who does not possess non-public information acted unreasonably in

relying on the price of a security in an efficient market.  Instead, Vivendi relies on

the following three cases, all of which are inapposite: *Jones v. Intelli-Check, Inc.*;[72]

---

[69]     *See Basic*, 485 U.S. at 248.

[70]     *See, e.g., Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 167 (2d Cir. 2000) ("Under [the truth on the market] corollary, a misrepresentation is immaterial if the information is already known to the market because the misrepresentation cannot then defraud the market.").

[71]     *See* Opp. Mem. at 1 (acknowledging that Vivendi is collaterally estopped from contesting materiality or introducing the truth on the market defense).

[72]     274 F. Supp. 2d 615 (D.N.J. 2003).

*Cromer Financial Ltd. v. Berger*;[73] and *In re ML-Lee Acquisition Fund II, L.P. &*
*ML-Lee Acquisition Fund (Ret. Account) II, L.P. Securities Litigation*.[74]

In *Jones*, the district court held that, under Third Circuit precedent, the
plaintiff short-sellers were not entitled to the fraud on the market *presumption*, but
could directly prove reliance by establishing the elements of fraud on the market.[75]
The Third Circuit, in a pre-*Basic* opinion, identified "the reasonableness of the
reliance [on market price]" as one of the presumptions created by fraud on the
market.[76] *Jones* ultimately held that the plaintiffs could not prove reliance because,
by their own admission, their awareness of the fraud – based on conflicting public
statements – is what induced them to transact in the security.[77] *Jones*, then, merely

---

[73]     205 F.R.D. 113 (S.D.N.Y. 2001).

[74]     149 F.R.D. 506 (D. Del. 1993).

[75]     *See Jones*, 274 F. Supp. 2d at 632-33 (discussing *Zlotnick v. TIE
Commc'ns*, 836 F.2d 818, 821 (3d Cir. 1988)).  The continued soundness of the
exception to fraud on the market that *Zlotnick* created for short-sellers is dubious.
*See generally In re Initial Public Offering Secs. Litig.*,  227 F.R.D. 65, 109 n.334
(S.D.N.Y. 2004), *vacated on other grounds by* 471 F.3d 24 (2d Cir. 2006).

[76]     *Jones*, 274 F. Supp. 2d at 632 ("That theory creates a three-fold
rebuttable presumption of reliance: first, the court presumes that the
misrepresentation or fraudulent act affected the market price; second, it presumes
that plaintiff did in fact rely on the price of the stock as indicative of its value at the
time plaintiff purchased the stock; *third, it presumes the reasonableness of that
reliance*.") (emphasis added) (discussing *Zlotnick*, 836 F.2d at 821).

[77]     *See id*. at 633 ("Plaintiffs were certainly not fooled by this tactic, for
they themselves explain that they perceived it as misleading when they noticed it in

-19-

stands for the proposition that materiality cannot be shown when the plaintiffs have already digested corrective information.  It is inapplicable here, however, because Vivendi is precluded from offering a truth on the market defense.[78]

In *Cromer*, a putative class brought an action against, among others, Deloitte & Touche Bermuda ("Deloitte"), the auditor of an offshore investment fund, alleging that Deloitte had issued clean audit reports for the fund despite having information that the fund's net asset value statements ("NAV's") were fraudulent.[79]  The court in *Cromer* ultimately applied a presumption akin to the fraud on the market presumption, despite the fact that the market in question was not open or developed, because the auditors' alleged misstatements ineluctably affected the price of the securities.[80]

Deloitte opposed class certification on the ground that information

---

IDN's previous filings and press releases—indeed, that is precisely why plaintiffs allege they began to short sell IDN's stock in the first place.").

[78]    *See* Opp. Mem. at 1.

[79]    *See Cromer Fin. Ltd.*, 205 F.R.D. at 118.

[80]    *See id.* at 130 ("In some ways this is an even stronger case for applying a presumption than those that have embraced the [fraud on the market theory] since it would not be based on the assumption that the representations from either Ernst & Young or Deloitte affected the price. Instead, the Ernst & Young calculations and NAV statements *were* the price per share, and Deloitte's audits were an explicit confirmation of the process for calculating that price.") (emphasis in original).

calling the reliability of the NAV's into question had begun to circulate prior to the

Class Period.[81]  Citing to the "reasonable reliance" line of cases cited above, the

court in *Cromer* stated that: "the admitted sophistication of the investors weighs in

favor of a heightened burden of diligence. While a jury will determine whether any

failure by Hackl or Meijer–Werner [the putative class representatives] to engage in

further inquiry was reckless or unjustified, nothing presented by Deloitte suffices

to undermine the soundness of a presumption of reliance in this case."[82]  *Cromer*,

then, stands for the proposition that sophisticated investors cannot maintain an

action for securities fraud in private-market transactions when they could have

discovered the truth with minimal diligence.  Here, GAMCO purchased Vivendi's

securities on the open market,[83] and Vivendi is foreclosed from offering a truth on

the market defense.  *Cromer* is therefore inapposite.

Finally, *M-L Lee*, a District of Delaware case, holds that sophisticated

plaintiffs in private-market transactions are held to a higher standard of due

---

[81]  *See id*. at 132.

[82]  *Id*. at 132-33 (footnote omitted).

[83]  *See* GAMCO's 9/15/9 Amended Complaint for Violations of the
Federal Securities Laws ¶ 214(c); Opp. Mem. at 5 (stating that "GAMCO
purchased Vivendi stock throughout the relevant period") (citation omitted); Reply
Mem. at 6 ("In the present case, it is clear that GAMCO executed each Vivendi
ADR transaction on the New York Stock Exchange and never in the face-to-face
context.").

diligence and that, because the putative lead plaintiffs might be subject to unique

defenses which would destroy the typicality requirement for class certification,

defendants were entitled to discovery of the plaintiffs' investment history.[84]  In *M-*

*L Lee*, the court stated that "[p]laintiffs' sophistication may preclude a finding that

the Plaintiffs relied on the alleged fraud in purchasing the securities."[85]  In other

words, the "unique defense" that might be deployed against the lead plaintiffs

relates to their *actual* reliance, not to whether it would be *unreasonable* to rely on

the market price of a security.

   Moreover, "almost all of the cases in which courts have found that a

sophisticated investor had an enhanced duty to investigate involved face-to-face

transactions, not purchases on an open securities market."[86]  This is the case

because a rule requiring investors to independently investigate securities sold on

---

[84] *See In re ML-Lee Acquisition Fund II, L.P. and ML-Lee Acquisition Fund (Retirement Accounts) II, L.P. Secs. Litig.*, 149 F.R.D. at 508.

[85] *Id.*

[86] *Maverick Fund, L.D.C.*, 801 F. Supp. 2d at 57 (collecting cases).  An illustration of this Circuit's typical application of the "unreasonable reliance" test is provided by *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189 (2d Cir. 2003).  In that case, the court applied the *Brown* factors to a face-to-face transaction, and concluded that:  "[g]iven the sophistication of this financial transaction and of the parties, and absent any allegation of a fiduciary relationship, the personal friendship between Waldron and Hansen does not make appellant's reliance on the alleged extra-contractual representations reasonable." *Id.* at 196.

the open market would vitiate the disclosure requirements of the Exchange Act.[87]

Such a rule would also be inefficient, as it would require buyers of securities to

investigate matters known to the seller.  The Seventh Circuit has drawn a useful

analogy to the law of torts:

> This is just another way to state the common law rule that
> contributory negligence is not a defense to an intentional or
> reckless tort.  The best solution is for people not to harm others
> intentionally, not for potential victims to take elaborate
> precautions against such depradations.  If the victims' failure to
> take precautions were a defense, they would incur costs to take
> more precautions (and these costs are a form of loss victims would
> feel in every case, even if the tort does not occur), while would-be
> tortfeasors would commit additional torts because they would not
> fear the need to pay up in cases where the victims do not protect
> themselves.  Common law courts have balked at such an outcome
> in ordinary tort cases, and securities law has followed the same
> path.[88]

In sum, sophisticated investors are not held to a higher standard of due

diligence than ordinary investors when they purchase securities on the open

market, as GAMCO did.[89]  Vivendi acknowledges that it is precluded from

---

[87]     *See Maverick Fund, L.D.C.*, 801 F. Supp. 2d at 57 ("Such a
requirement would undermine the purpose of the Exchange Act, which relies on a
philosophy of full disclosure to insure honest securities markets and thereby
promote investor confidence.") (quotation marks and citations omitted).

[88]     *Teamsters Local 282 Pension Trust Fund v. Angelos*, 762 F.2d 522,
528 (7th Cir. 1985) (citations omitted).

[89]     *See* GAMCO's 9/15/9 Amended Complaint for Violations of the
Federal Securities Laws ¶ 214(c); Opp. Mem. at 5 (stating that "GAMCO

-23-

contesting materiality or introducing a truth on the market defense.[90]  However,

Vivendi presents evidence that GAMCO's analysts were experts in Vivendi's

industry and that they participated in, or read transcripts of, a number of meetings

and conference calls with Vivendi's management.[91]  On this basis, Vivendi argues

that "[a] jury could find that GAMCO's reliance was unreasonable either because

GAMCO learned information during meetings or conference calls or from its own

research that undermined Vivendi's public statements, or because given what

GAMCO knew from its research and experience, it should have asked questions

that would have led to the truth."[92]

>    To the extent that Vivendi's argument is that GAMCO *should have*

unearthed information that would have led it to discount Vivendi's

misrepresentations, such arguments fails because contributory negligence is not a

defense to securities fraud.  The argument that GAMCO *could have* unearthed such

information, though, presents a fact issue for trial.  GAMCO insists that the "fact

---

purchased Vivendi stock throughout the relevant period") (citation omitted); Reply
Mem. at 6 ("In the present case, it is clear that GAMCO executed each Vivendi
ADR transaction on the New York Stock Exchange and never in the face-to-face
context.").

[90]    *See* Opp. Mem. at 1.

[91]    *See id*. at 14-15.

[92]    *Id*. at 15.

that GAMCO did not trade while in possession of non-public information" is "undisputed."[93]  However, Vivendi has presented evidence establishing that GBL employees privately corresponded and/or met with Vivendi management during the relevant time period.[94]  These employees went on to disavow any specific knowledge of the correspondences and meetings, but the credibility of such denials is a fact best determined at trial.

If GAMCO learned corrective non-public information from these meetings or correspondences, it would serve to rebut the fraud on the market presumption of reliance by demonstrating that GAMCO did not rely on the misstatements incorporated into the market price of Vivendi securities.  Stated differently, GAMCO cannot claim that it reasonably relied on the market price of Vivendi securities if it knew that the securities' price was inflated by fraud, but purchased them anyway.

In sum, Vivendi has presented enough evidence that GAMCO "'had access to and knowledge of'" corrective information to withstand summary judgment.[95]  I therefore conclude that there is a material question of fact with

---

[93]     Reply Mem at 1.

[94]     *See* 56.1 Counter-statement ¶ 10 (citations omitted).

[95]     Feb. 17 Op., 765 F. Supp. 2d at 585 ("'[D]efendants may seek to rebut a presumption of reliance by demonstrating that individual debenture holders [of

respect to the reasonableness of GAMCO's reliance.

> **B.    Vivendi Has Raised Material Question of Fact as to Whether GAMCO Purchased Vivendi Securities Regardless of Their Market Price**

Vivendi's two remaining arguments opposing summary judgment are closely related.  Vivendi argues that there is a material issue of fact with respect to reliance because: *first*, the brand of value-based investing that GAMCO applied to Vivendi did not take into account the price of Vivendi's shares;[96] and *second*, GAMCO in fact continued to purchase Vivendi shares after Vivendi's fraud was exposed.  Because these arguments are related, I will address them together.

It is somewhat ironic that GAMCO, a value-based investor, is relying on the fraud on the market presumption, which is grounded on the reliability of the market price that value-based investors spend their lives second-guessing.  In support of its argument that GAMCO's investment in Vivendi was not induced by the market price of Vivendi's securities, Vivendi presents the statements of a

---

publicly traded securities publicly] had access to and knowledge of the omitted information, and therefore placed no reliance on the tender documents'") (quoting *Fisher v. The Plessey Co., Ltd.*, 103 F.R.D. 150, 156 (S.D.N.Y. 1984)) (alterations in original).

[96]     *See* Opp. Mem. at 13 ("GAMCO does not rely on the integrity of the market to value shares accurately, because its entire strategy for purchasing shares depends on the assumption that the market price does not reflect a company's true value.").

number of GBL employees stating that PMV does not take market price into account.[97]  In support of its argument that GAMCO continued to invest in Vivendi after its fraud was revealed, Vivendi states that "[a]ccording to Dr. Blaine Nye [plaintiffs' expert in the Class Action], Vivendi's true liquidity condition began to be revealed on January 7, 2002, when it announced that it would sell some of its treasury shares[,]"[98] but GAMCO increased its holdings in Vivendi after that date.

In fact, "GAMCO made its largest one-day purchase of Vivendi shares on July 2, 2002, a day on which Dr. Nye testified that Vivendi's true liquidity condition was revealed by credit rating downgrades to junk status."[99] Citing to statements made by various GBL employees, Vivendi contends that GAMCO continued to invest in Vivendi after its liquidity condition had been revealed because its view of Vivendi's underlying assets had not changed.[100]  As such, Vivendi argues that there is a material issue of fact with respect to whether GAMCO relied on the market price of Vivendi's shares.

In response, GAMCO argues that Vivendi's "subjective belief that a

---

[97]     *See id*. at 13-14.

[98]     *Id*. at 10. (citation omitted).

[99]     *Id*. (citations omitted).

[100]    *See id*. at 11-12.

security's market price is undervalued is [in]sufficient to destroy [GAMCO]'s
reliance on the integrity of the market[,]" because every investor thinks the
securities they transact in are over- or under-valued.[101]  Relatedly, GAMCO alleges
that it did, in fact, rely on the market price of Vivendi's securities, insofar as it
thought that Vivendi's securities were undervalued.[102]  Building on this point,
GAMCO cites a District of Rhode Island case for the proposition that "[t]he mere
fact that different 'traders have divergent motivations in purchasing shares should
not defeat the fraud-on-the-market presumption absent convincing proof that price
played *no* part whatsoever in their decision making.'"[103]

      According to GAMCO, the relevant inquiry is whether it would have
entered the same transactions at the same prices absent Vivendi's fraud; whether
GAMCO would have entered into *different* transactions at *different* prices is of no
moment.[104]  And because Vivendi "merely speculates that, had the market known
the truth of the fraud[,] . . . GAMCO would have likely entered into different
transactions (at lower prices) for the same Vivendi securities[,]" GAMCO

---

[101]    Reply Mem. at 2.

[102]    *See id*. at 7.

[103]    *Id*. (quoting *Rosen v. Texatron, Inc.*, 369 F. Supp. 2d 204, 212 (D.R.I.
2005) (emphasis in original) (further citations omitted)).

[104]    *See id*. at 8-9 (citations omitted).

concludes that there is not a material dispute of fact with respect to GAMCO's reliance on the market price.[105]

GAMCO further argues that it did not rely solely on PMV when it decided to invest in Vivendi and that, in any case, PMV is not insensitive to accounting fraud.  In support of the first point, GAMCO quotes the June 25, 2007 deposition of Mario Gabelli, in which Gabelli states that GAMCO "[would determine if Vivendi securities were undervalued] . . . using a variety of stock specific dynamics . . . [including] [e]arnings per share, PMV, EBITDA [(earnings before income, tax, depreciation, and amortization)] . . . a whole mosiac."[106]  In support of the second point, GAMCO quotes the October 20, 2006 deposition of one of its portfolio managers, who stated that "'[PMV] relies very heavily on the integrity of the financial statements of the companies [a portfolio manager] . . .  is looking at. . . . [I]f anybody is cooking the books . . . the methodology doesn't work very well.'"[107]

---

[105]     *Id*. at 8 (emphasis removed).

[106]     *Id*. at 9-10 (quoting 6/25/07 Deposition of Mario Gabelli, Ex. E to Declaration of Vincent R. Cappucci in Support of Plaintiff's Motion for Summary Judgment against Defendant Vivendi, S.A. ("Cappucci Decl."), at 163:11-21) (emphasis removed).

[107]     *Id*. at 10 (quoting 10/20/06 Deposition of Henry Van der Eb, portfolio manager at GAMCO, Ex. H to Cappucci Decl., at 36:21-37:3).

Finally, GAMCO contends that its post-disclosure purchases of Vivendi securities do not rebut the presumption of reliance because "the Class Action jury necessarily determined that the market price of Vivendi [securities] decreased following each material partial disclosure[,]"[108] meaning that GAMCO still relied on the market price following each disclosure.  In support of this position, GAMCO cites to three cases that state that "averaging down" – *i.e.*, purchasing additional shares of a security that has decreased in value – does not create an atypical defense, defeating class certification when reliance is based on a fraud on the market theory.[109]  GAMCO concedes that the first corrective disclosure was on January 7, 2002, but points out that less than one-third of GAMCO's Vivendi purchases were made after January 7, 2002.[110]

As an initial point, it bears repeating that class certification  and the class jury trial have passed, and that the current posture of the instant case involves Vivendi's challenge to GAMCO's reliance.  The February 17 Opinion notes that questions of individual reliance will not defeat class certification when a trial on

---

[108]     *Id*. at 11.

[109]     *See id*. at 11-12 (citing *In re Moody's Corp. Sec. Litig.*, 274 F.R.D. 480, 488 (S.D.N.Y. 2011); *Cosmas v. Delgiorno*, No. 94 Civ. 1974, 1995 WL 62598, at *4 (E.D.N.Y. Feb. 8, 1995); and *Malone v. Microdyne Corp.*, 148 F.R.D. 153, 159 (E.D. Va. 1993)).

[110]     *See id*. at 12-13 (citations omitted).

common issues is possible, but rather will "call for separate inquiries into the

individual circumstances of particular class members."[111]  This is one such

"separate inquir[y]."  As such, the cases cited by GAMCO that relate to whether to

certify a securities fraud class are inapposite at this stage in the litigation,[112]

because they stand only for the proposition that "'the extent of any non-reliance . . .

[is] a fact question to be decided at trial . . . .'"[113]  In other words, an investor's lack

of reliance on the market price and/or post-disclosure purchases may not defeat the

typicality requirement for class certification.  But that does not imply that non-

class plaintiffs may assert res judicata on the reliance issue as soon as a class has

been certified.

---

[111]    Feb. 17 Op., 765 F. Supp. 2d at 584 (collecting cases where securities fraud classes were certified despite the existence of questions of individual reliance).

[112]    *See, e.g.,* Reply Mem. at 3 (citing the following class-action certification cases: *In re Pfizer Inc. Sec. Litig.*, 282 F.R.D. 38, 45 (S.D.N.Y. 2012); *In re IMAX Sec. Litig*, No. 06 Civ. 6128, 2011 WL 1487090, at *7 (S.D.N.Y. Apr. 15, 2011); *In re Worldcom Sec. Litig.*, 219 F.R.D. 267, 281-82 (S.D.N.Y. 2003); and *Rosen*, 369 F. Supp. 2d at 212).

[113]    *City of Livonia Employees' Retirement Sys. v. Wyeth*, 284 F.R.D. 173, 179 (S.D.N.Y. 2012) (quoting *In re Indep. Energy Holdings PLC Sec. Litig.*, 210 F.R.D. 476, 484 (S.D.N.Y. 2002)).  In its reply brief GAMCO quotes the previous sentence of *City of Livonia*, which states that "courts in this district have found that where plaintiff's theory of liability is premised on the fraud on the market presumption, Defendants' allegations that the lead plaintiffs investments were not made in reliance on alleged misstatements are largely irrelevant[,]" but GAMCO omits the sentence quoted in the body text.  Reply Mem. at 8.

Equally inapposite are GAMCO's citations to a line of cases that stand for the proposition that short-sellers are entitled to the fraud on the market presumption, despite the fact that short-sellers buy securities that they think are undervalued.[114]  At best, these cases establish only that plaintiffs who trade in securities that they believe are undervalued may, as a matter of law, invoke the fraud on the market presumption.  They do not speak to how that presumption may be rebutted.[115]  And they do not imply that, absent insider information, the fraud on the market presumption is irrebuttable as against any investor who purchased a security at market value, as GAMCO at times appears to argue.[116]

At its core, GAMCO's argument is that Vivendi has not raised a material issue of fact because it has not shown that: (1) GAMCO would have

---

[114]    *See, e.g.,* Reply Mem. at 2-3 (citing *Argent Classic Convertible Arbitrage Fund L.P. v. Rite Aid Corp*, 315 F. Supp. 2d 666, 676 n.13 (E.D. Pa. 2004); *In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202, 1263 (S.D. Cal. 2010)).

[115]    *See, e.g., Argent Classic Convertible Arbitrage Fund L.P.*, 315 F. Supp. 2d at 676-77 ("we hold that *Zlotnick* does not require us to withhold from the Argent Companies the benefit of the fraud on the market presumption of reliance.  They have adequately pled that Rite Aid securities traded in efficient markets, so they are, *for now*, entitled to that presumption.  Thus, we shall not dismiss the Section 10(b) claim for failure to plead presumptive reliance.  The *defendants will have ample opportunity to rebut the presumption of reliance*") (emphasis added).

[116]    *See* Reply Mem. at 2-3.

entered the same transactions, at the same prices, absent the material misstatements; or that (2) GAMCO's post-disclosure transactions in Vivendi securities were not made in reliance on the integrity of the market price.  As to the first point, it is true that courts at times use the formulation that the fraud on the market presumption can be rebutted if "defendant can show that plaintiff would have purchased the stock at the same price even if [s]he had [] known the non-disclosed information . . . ."[117]  However, Vivendi has presented evidence – from the analyst charged by GBL with following Vivendi during the Class Period – that "the impact of Vivendi's liquidity crisis on GAMCO's PMV calculation would be 'minor.'"[118]  This is enough to raise a material question of fact as to whether GAMCO would have transacted in Vivendi securities even if it had known its true liquidity condition.  As discussed above, GAMCO disputes whether it actually relied solely on PMV as well as the extent to which PMV is insensitive to accounting fraud.  But this just supports my conclusion that reliance is an issue for trial.

---

[117]    *Lawrence v. Phillip Morris Cos., Inc.*, No. 94 Civ. 1494, 1999 WL 51845, at *4 (E.D.N.Y. Jan. 9, 1997).

[118]    *See* Opp. Mem. at 12 (quoting 8/31/06 Deposition of Andrew Rittenberry, Ex. 1 to Slifkin Decl., at 133:11-134:16).

All of the cases cited by GAMCO in support of the second point[119]
reflect the rule that "that post-disclosure purchases will not prevent an investor
from relying on the integrity of the market for pre-disclosure purchases[,] . . .
[because] [a]n investor who purchases a security after the disclosure of adverse
information still relies on the fact that the newly released information will be
absorbed by the market and therefore reflected in the post-disclosure price."[120]
Specifically, these cases hold that post-disclosure purchases of securities do not
*necessarily* rebut the fraud on the market presumption as a matter of law, meaning
that classes can be certified despite the presence of members who made post-
disclosure purchases.[121]  The cases do not imply that post-disclosure purchases are
*never* relevant to the plaintiff's reliance.

GAMCO acknowledges that post-disclosure purchases *can* defeat the
typicality requirement for class certification when "plaintiffs made a

---

[119]    *See* Reply Mem. at 10-12.

[120]    *In re DVI Inc. Sec. Litig.*, 249 F.R.D. 196, 204 (E.D. Pa. 2008).

[121]    *See, e.g., Feder v. Electronic Data Sys. Corp.*, 429 F.3d 125, 138 (5th
Cir. 2005) (holding that "the purchase of a company's stock after disclosure of
alleged fraud [does not] *necessarily* present[] a unique defense against that
purchaser such that Rule 23(a)(3) typicality is *categorically* precluded") (emphasis
added).

'disproportionately large percentage' of their purchases post-disclosure . . . ."[122] And the same result obtains "when a disclosure is so forceful that it becomes unreasonable for an investor, or the market, to continue to be misled by the defendants' alleged misrepresentation."[123]  By the same logic, it stands to reason that GAMCO's post-disclosure purchases of Vivendi securities are probative of whether GAMCO's investment strategy took market price into account.  GAMCO alleges that it "executed less than one-third of its total Class Period Vivendi ADR purchases, measured by volume, after the date of the first partial corrective disclosure . . . ."[124]  Once more, this merely strengthens the point that a material issue of fact exists.

In sum, Vivendi has raised a material question of fact as to whether GAMCO actually relied on the market price of Vivendi's securities when it invested in Vivendi.  GAMCO's post-disclosure purchases are probative of that reliance, or the lack thereof.  Therefore, GAMCO's motion for summary judgment is denied.

## VI.    CONCLUSION

---

[122]    Reply Mem. at 12-13 (quoting *City of Livonia*, 284 F.R.D. at 178).

[123]    *In re DVI Inc. Sec. Litig.*, 249 F.R.D. at 204 (quotation marks and citations omitted).

[124]    Reply Mem. at 12.

For the foregoing reasons, GAMCO's motion for summary judgment is denied.  The Clerk of Court is directed to close this motion (Docket No. 105).

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            January 10, 2013

**- Appearances -**

**For Plaintiff GAMCO:**

Vincent R. Cappucci, Esq.
Evan T. Raciti, Esq.
Entwistle & Cappucci LLP
280 Park Avenue, 26th Floor West
New York, New York 10017
(212) 894-7200

**For Defendant Vivendi, S.A.:**

Daniel Slifkin, Esq.
Paul C. Saunders, Esq.
Timothy G. Cameron, Esq.
Cravath, Swaine & Moore LLP
825 Eighth Avenue
New York, New York 10019
(212) 474-1000

Penny P. Reid, Esq.
James W. Quinn, Esq.
Weil, Gotshal & Manges LLP
767 Fifth Avenue, 25th Fl.
New York, New York 10153
(212) 310-8000