UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————————X

GAMCO INVESTORS, INC.,

                    Plaintiff,

                  v.

VIVENDI, S.A. (sued as VIVENDI
UNIVERSAL, S.A.),

                    Defendant.

-----------------------------------------------------

GAMCO GLOBAL SERIES FUNDS, INC.,
GABELLI CAPITAL ASSET FUND, THE
GABELLI VALUE FUND, INC., THE
GABELLI ASSET FUND, THE GABELLI
GLOBAL MULTIMEDIA TRUST, INC.,
and THE GABELLI EQUITY TRUST,
INC.,

                    Plaintiffs,

                  v.

VIVENDI, S.A.,

                    Defendant.

———————————————————————————X

**OPINION AND ORDER**

03 Civ. 5911 (SAS)

09 Civ. 7962 (SAS)



SHIRA A. SCHEINDLIN, U.S.D.J.:

I.     INTRODUCTION

        Plaintiffs bring this securities fraud action under Section 10(b) of the

Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder.[1]  They allege that a number of material misstatements and omissions made by defendant Vivendi, S.A. ("Vivendi") artificially inflated the price of Vivendi American Depositary Shares ("ADS's"), and that plaintiffs were harmed when they relied on this inflated price in connection with Vivendi ADS's that they purchased on the New York Stock Exchange ("NYSE") during the period running from October 30, 2000 through August 14, 2002 (the "Relevant Period").

Vivendi is collaterally estopped from denying any of the elements of plaintiffs' Section 10(b) claim save for reliance; plaintiffs are entitled to the fraud on the market presumption of reliance; and neither truth on the market nor allegations of no price impact are available as defenses to that presumption.[2] Moreover, the parties agree that: (1) during the Relevant Period, plaintiffs did not possess non-public corrective information about Vivendi's misstatements;[3] (2) the plaintiffs did not directly rely on Vivendi's material misstatements;[4] (3) during the

---

[1]     The Court has subject matter jurisdiction over this Section 10(b) claim under 28 U.S.C. § 1331, and venue is proper.

[2]     *See GAMCO Investors, Inc. v. Vivendi, S.A.* ("SJ Op."), 2013 WL 132583, at *1 (S.D.N.Y. Jan. 10, 2013); Joint Pre-Trial Order ("JPTO") at 21-22.

[3]     *See* JPTO at 13.

[4]     *See* Plaintiffs' Trial Memorandum of Law ("Pl. Mem.") at 1.

Relevant Period, the market for Vivendi ADS's was efficient;[5] and (4) if plaintiffs are entitled to damages, such damages shall total $3,544,917.68, exclusive of any applicable pre-judgment interest.[6]

       In short, the only issue in this case is whether Vivendi can rebut the fraud on the market presumption of reliance. Moreover, Vivendi must attempt this rebuttal without arguing that the market for Vivendi ADS's was inefficient, that there was no price impact, that the truth about Vivendi's misstatements was known to the market, or that the plaintiffs were in possession of corrective non-public information. A bench trial on this narrow issue was held from February 18, 2013 to February 19, 2013. The following findings of fact and conclusions of law are made under Rule 52(a) of the Federal Rules of Civil Procedure ("FRCP"). In reaching these findings and conclusions, I heard the evidence, observed the demeanor of the witnesses, and considered the arguments and submissions of counsel. For the following reasons, judgment shall be entered in favor of Vivendi.

---

[5]    *See* JPTO at 3. More specifically, the parties stipulate that, during the Relevant Period, the market for Vivendi ADS's was efficient under the factors set forth in *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989). *See* 2/18/13 Trial Transcript ("Tr.") at 149:1-7.

[6]    *See* JPTO at 13. *But cf. id*. at 13 n.2 (stating that this stipulation is contingent on the prospective judgment in the Vivendi class action not being reversed, modified, or vacated on appeal).

## II.   FINDINGS OF FACT[7]

### A.   The Parties

#### 1.   Plaintiffs

The plaintiffs in this case are a number of companies that, during the Relevant Period, were subsidiaries of Gabelli Asset Management, Inc. ("GBL," and collectively with its subsidiaries, the "Gabelli Family").[8]  GBL was founded by Mario Gabelli, who served as the Chairman, Chief Executive Officer, and Chief Investment Officer ("CIO") of GBL during the Relevant Period.[9]  During the Relevant Period, plaintiff GAMCO Investors, Inc. ("GAMCO"), a wholly owned subsidiary of GBL, was a registered investment advisor providing managed account services to a broad array of clients.[10]  In essence, GAMCO functioned as an investment advisor and asset management service for institutional investors and

---

[7]     Familiarity with the prior proceedings in this case is assumed.

[8]     *See* JPTO at 3.

[9]     *See id*.; Pl. Mem. at 3.  Somewhat confusingly, GBL changed its name in 2005 to GAMCO Investors, Inc., which, during the Relevant Period, was the name of a separate entity that is a plaintiff in this case.  *See* 2/18/13 Trial Transcript ("Tr.") (Direct Examination of Douglas Jamieson ("Jamieson Direct")) at 116:6-12.  The companies in question will be referred to by their Relevant Period names, except where otherwise noted.

[10]     *See* JPTO at 3.

high net-worth individuals.[11]

During the same period, Gabelli Funds, LLC, another subsidiary of GBL, managed plaintiffs GAMCO Global Series Funds, Inc., Gabelli Capital Asset Fund, The Gabelli Value Fund, Inc., The Gabelli Asset Fund, The Gabelli Global Multimedia Trust, Inc., and The Gabelli Equity Trust, Inc. (collectively, the "Mutual Fund Plaintiffs," and collectively with GAMCO, the "Plaintiffs").[12]  The Mutual Fund Plaintiffs were a group of proprietary mutual funds within the Gabelli Family.[13]

Finally, throughout the Relevant Period, Gabelli & Company, Inc. ("Gabelli & Co.") was an indirect subsidiary of GBL, with Gabelli Securities, Inc. interposed in the middle.[14]  It served as "the research arm of GBL[,]" in which capacity it "performed research for GAMCO and the Mutual Fund Plaintiffs."[15]

Specifically, during the Relevant Period, investment analysts employed by Gabelli & Co. performed research for the benefit of, among others, portfolio managers at GAMCO and the Mutual Fund Plaintiffs, and reported the

---

[11]     *See* 2/18/13 Tr. (Jamieson Direct) at 117:5-22.

[12]     *See id*. at 118:10-119:12.

[13]     *See id*. at 118:14-17.

[14]     *See id*. at 120:10-17.

[15]     JPTO at 3.

results of this research,  — as well as recommendations as to whether to buy, sell, or hold securities  — at daily morning meetings held by GBL.[16]

### 2.    Defendant[17]

Defendant Vivendi is a French multimedia company that listed ADS's on the NYSE during the Relevant Period.  Beginning in the late 1990s, it engaged in a series of mergers and acquisitions, including a three-way merger between Vivendi, The Seagram Company Ltd., and Canal Plus, S.A. that was announced on October 30, 2000.  As a result of this activity, Vivendi took on significant debt, and eventually faced a liquidity crisis.  The material misstatements and omissions during the Relevant Period all relate to Vivendi's alleged attempts to cover up this liquidity crisis.

In the class action, plaintiffs' expert witness, Dr. Blaine Nye, identified January 7, 2002, May 3, June 21, June 24, July 2, July 3, July 10, July 15, and August 14, 2002 as dates on which corrective disclosures revealed

---

[16]    *See* 2/18/13 Tr. (Jamieson Direct) at 122:6-8.

[17]    Certain facts found in this section are drawn from the opinion *In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512 (S.D.N.Y. 2011).  The Court takes judicial notice of these facts under Federal Rules of Evidence 201(b)(2).  These facts are not materially in dispute for the purposes of this motion, although both parties continue to preserve all objections for appeal.

Vivendi's true liquidity condition and alleged fraud.[18]  By August 14, 2002, these

corrective disclosures had completely revealed Vivendi's true liquidity condition,

and the full extent of the alleged fraud.[19]  I will therefore refer to the period

running from January 7, 2002 to August 14, 2002 as the "Corrective Disclosure

Period."

> **B.   The Witnesses**

Five witnesses testified at the trial: Andrew Rittenberry, Douglas

Jamieson, Bruce Alpert, Anthony Hartswell Woodson III,[20]  and Mario Gabelli.

After graduating from Columbia Business School in 2000, Rittenberry worked as

an investment analyst for Gabelli & Co. from July 2000 to early 2004.[21]  In this

capacity, he was assigned to follow the media industry, *i.e.*, keep track of trends

and monitor GBL's holdings in the industry, and communicate his findings to

---

[18]     *See* JPTO at 3.

[19]     *See id*.

[20]     The parties stipulated that Woodson was unavailable for trial within
the meaning of FRCP 32(a)(4).  *See* JPTO at 14 n.3.  As a result, his testimony was
received through a videotaped deposition played in court during the first day of the
trial.  This presentation allowed the Court to evaluate Woodson's demeanor.  The
parties subsequently submitted a transcript of Woodson's deposition for the
Court's review.

[21]     *See* 2/18/13 Tr. (Direct Examination of Andrew Rittenberry
("Rittenberry Direct")) at 30:3-31:1.

portfolio managers in the Gabelli Family.[22]  During the Relevant Period, he was the only analyst at Gabelli & Co. who followed Vivendi.[23]

Like Rittenberry, Jamieson graduated from Columbia Business School before starting his career at the Gabelli Family in 1981.[24]  During the Relevant Period, Jamieson was employed as the Chief Operating Officer of GAMCO, in which capacity he continues to serve today (although GAMCO's name has since changed).[25]

After earning a Master's degree in Business Administration from Rensselaer Polytechnic Institute in 1974, Alpert worked as an auditor for PriceWaterhouse for eight years, before leaving to serve as Vice-President and Treasurer of Smith Barney's mutual funds for two years.[26]  Since 1988, Alpert has served as the Chief Operating Officer of Gabelli Funds, LLC; and during the Relevant Period, he was the President and Treasurer of the Mutual Fund

---

[22]     *See id*. at 31:2-20.

[23]     *See id*. at 33:3-5.

[24]     *See id*. (Jamieson Direct) at 115:1-5.

[25]     *See id*. at 115:14-115:3.

[26]     *See id*. (Direct Examination of Bruce Alpert ("Alpert Direct")) at 131:22-132:7.

Plaintiffs.[27]

Woodson worked for a company in the Gabelli Family — likely GBL — from November of 1993 to February 28, 2006.[28]  From April 2001 through December 2004, Woodson managed GBL's London office; for the rest of his tenure at GBL, he served as a Senior Vice President.[29]  In this capacity, and during the Relevant Period, he managed investment accounts on behalf of GAMCO clients, and served as the portfolio manager of certain GBL mutual funds that invested in convertible bonds.[30]

Mario Gabelli founded Gabelli & Company on January 1, 1977, and he has worked for the Gabelli Family ever since.[31]  In his capacity as CIO during the Relevant Period, Gabelli had ultimate responsibility for the investments made by the Gabelli Family, although portfolio managers serving under Gabelli generally made the day-to-day decisions as to which securities to buy, sell, or

---

[27]     *See id*. at 132:17-19; 133:25-134:10.

[28]     *See* 8/3/06 Deposition of Anthony Hartswell Woodson III ("Woodson Dep.") at 6:17-7:16.

[29]     *See id*. at 7:17-24.

[30]     *Id*. at 17:19-20:16; 25:12-23.

[31]     *See* 2/19/13 Tr. (Direct Examination of Mario Gabelli ("Gabelli Direct")) at 159:1-10.

hold.[32]

A few words on Gabelli's demeanor and credibility are warranted. Gabelli appeared ill at ease with answering direct questions candidly, as if he took his oath subject to the reservation that he be permitted to define "the truth." Consistent with this understanding, Gabelli interpreted simple questions as invitations to philosophize, prevaricate, and palaver.[33]  He would not directly answer whether he had read or endorsed an article that appeared in Cigar Afficionado under his name.[34]  Similarly, when asked whether the December 31,

---

[32]     See id. at 159:16-19; Woodson Dep. at 20:4-16.

[33]     See, e.g., 2/19/13 Tr. (Gabelli Direct) at 193:16-24 ("Q. [Referring to an article written by Mario Gabelli] Does that [passage] suggest that the [] public market price might not be an accurate reflection of intrinsic value, depending upon investor psychology?  A.  On a given day, the market knows everything that exists to the degree that that price in the public market reflects that, that would reflect all of the elements.  For example, when President Eisenhower got assassinated — not assassinated, had a heart attack, the market dropped sharply.  And it reflected that dynamic."); id. at 227:18-228:6 (Redirect Examination of Mario Gabelli ("Gabelli Redirect")) ("Q.  Do you actually remember what determinations preceded your decision to purchase Vivendi stock during the [R]elevant [P]eriod?  A.  The mosaic that I follow, as a race car driver or a pilot and a checklist, if I were a pilot there would be a checklist.  I don't have a checklist on my desk.  But trained as a professional, there are things that I ask daily/weekly in terms of the portfolio and the security that we select: What is the price in the public markets?  [H]ow much do I want to own for this client?  [A]nd so on.  Those are the elements, if you're asking me what I would look at.  Q. Could you answer my question.  A. I thought I did.").

[34]     See id. at 191:7-23 (discussing Defendant's Exhibit ("DX") Z at 00000033-35) (pin citations to exhibits refer to their Bates numbers) (article

2000 Annual Report of the Gabelli Asset Fund bore his signature,[35] he stated that "[i]t is a facsimile of one of the many signatures that I use that are on file for me[,]"[36] and then affected surprise that the contents of a document bearing his signature might be imputed to him.[37]

Gabelli's attitude is fairly encapsulated by an answer he gave when confronted with his deposition testimony during the trial:

> Q    [Reading a passage from Gabelli's deposition transcript] Was that answer true at the time you gave it?
>
> A    There were many questions prior to that, and I tend to talk a lot and explain a lot.  Obviously, I'm not going to say this is not true, but I don't know the context in which it's true

---

prepared for Cigar Afficionado Magazine, under Mario Gabelli's name, affixed to December 31, 2001 Annual Report of The Gabelli Asset Fund) ("The Court: Do you know if this is the text of an article you wrote for Cigar Afficionado?  The Witness: You know, I can't remember, but my name is on it, and I have had help preparing and editing articles in the past.  And this may be one of those.  Q: By allowing your name to be put on it, did you adopt it as yours? A: I don't understand the question.  The Court: Well, by letting it be published as an article by Mario J. Gabelli, did you acknowledge it as yours?  The Witness: I never wrote to anyone telling them it's not something I can live with.  I probably didn't read it after it was published anyway.  The Court: That's not the question.  The Witness: I know.  The Court: If it says 'by Mario Gabelli,' do you understand and accept that it's yours?  The Witness: I have never refuted that it was mine.").

[35]    *See* 12/31/2000 DX D, at 00000017.

[36]    2/19/13 Tr. (Gabelli Direct) at 199:12-13.

[37]    *See id*. at 199:14-200:2.

or not true.[38]

During summations, Plaintiffs' counsel stated: "I would ask that you accept [Gabelli] as a person who wants to be precise and that he is trying to be precise in a very important case."[39]  Having observed Gabelli's demeanor and heard his testimony, I find that he was not driven by a desire for precision on the witness stand.  Instead, his testimony amounted to motivated hairsplitting by an interested witness.  In short, I find that Gabelli's testimony was not credible.

**C.   Plaintiffs' Decision to Buy Vivendi ADS's**

**1.   Plaintiffs' Investment Philosophy**

Plaintiffs' investment philosophy is to "identify companies with dominant industry positions that are selling at substantial discounts to their intrinsic Private Market Values [("PMV")][,]"[40] and then find "a catalyst or an event that will surface value and attract investor attention."[41]  The PMV of a company is the price that an informed industrialist would be willing to pay for it, if

---

[38]     *Id*. (Gabelli Redirect) at 226:10-15.

[39]     *Id*. (Plaintiffs' Summation) at 233:22-24.

[40]     DX J (3/31/01 Gabelli Asset Management Inc. PowerPoint Presentation) at 134.0011.

[41]     *Id*. at 134.0017.

each of its segments were valued independently in a private market sale.[42]  It is

separate and distinct from the company's market capitalization, *i.e.*, the public

market price of its shares times the number of shares outstanding, which, according

to the Gabelli Family philosophy, can be irrational and sentimental, thereby

providing value-based investors an opportunity to make a profit.[43]

GBL invests in a company when its PMV is substantially higher than

its market capitalization, and there is a "catalyst," *i.e.*, "some dynamic that is going

to . . . cause the market price to rise to the level of" PMV.[44]  The PMV of a

company, and whether a catalyst exists, are determined using techniques that are

proprietary to GBL.[45]  This determination involves using "historical knowledge

and experience[,]" "industry knowledge" and "creative thinking" to identify "what

the possibilities could be for a company, to unlock its intrinsic value."[46]  The

---

[42]     *See* Woodson Dep. at 145:5-7.

[43]     *See id*. at 145:7-21.  *See also* DX Z at 00000033 ("It is our, and every
prudent investor's job to try to determine the intrinsic value of an individual
company or the market as a whole . . . .  Whether stocks trade at, above, or below
intrinsic value is a function of investor psychology.  Mr. Market is the code name
the traditional value investor uses to personify investor psychology.").

[44]     2/18/13 Tr. (Rittenberry Direct) at 43:4-14.  *See* Woodson Dep. at
149:14-22.

[45]     *See* Woodson Dep. at 86:17-87:8.

[46]     *Id*. at 86:24-87:21.

Gabelli Family equates a company's PMV with its "intrinsic value."[47]

During the Relevant Period, Rittenberry — the only analyst at GBL following Vivendi — calculated the PMV of Vivendi using the proprietary techniques that he learned at Gabelli & Co.[48] Based on Rittenberry's calculation of Vivendi's PMV, during the Relevant Period, Vivendi securities were trading at a substantial discount to Vivendi's PMV per ADS.[49] Mario Gabelli personally asked for and reviewed Rittenberry's calculation of Vivendi's PMV during the Relevant

---

[47] *See, e.g.,* DX N (5/12/01 Gabelli Asset Management, Inc. PowerPoint presentation, Sixteenth Annual Meeting held at the Pierre Hotel, New York City) at 0042-0044 (describing GBL's "investment process" as "identify[ing] [the] intrinsic value of each business"); *id.* at 0049 (a graph entitled "PMV vs. Mr. Market" showing that GBL's investment strategy is to buy shares when their public market value is below their PMV per share); DX AZ (7/26/06 Gabelli promotional materials sent to investors) at 0009 ("Our goal is to identify companies in the public market that are selling at differences to their intrinsic or private market values"); DX BE (12/27/12 print-out from GAMCO website) ("GAMCO Investors, Inc. is best known for its research-driven, value-oriented equity investing expertise . . . investing in undervalued companies that have a high probability of achieving their intrinsic or private value over time."); Woodson Dep. at 77:17-24 ("[E]very analyst [at GBL] typically does an in-depth analysis of the companies that they're covering by constructing an Excel type based spreadsheet [*i.e.*, PMV] which analyzes the different business segments of the firm in order to establish what we think its intrinsic value is[.]"); 2/18/13 Tr. (Jamieson Direct) at 123:6-12 ("Q. And undervalued in this context means that the public stock price of a company was trading below its intrinsic value, correct?  A. Yes.  Q. And that intrinsic value was represented by GAMCO's calculation of that company's [PMV], right? A. Yes.").

[48] *See* 2/18/13 Tr. (Rittenberry Direct) at 47:15-17.

[49] *See* DX AU (01/11/01 print-out of Rittenberry spreadsheet calculating Vivendi's PMV).

Period.[50]  Rittenberry also sent his estimation of Vivendi's PMV to Marc Gabelli, a

portfolio manager at Gabelli, and Vicent Roche, a trader at Gabelli, on April 5,

2001.[51]  And Woodson relied on  Rittenberry's analysis of Vivendi's PMV in his

decision to purchase high-yield Vivendi bonds, from which I infer that senior

management at Vivendi trusted Rittenberry's analysis.[52]  This inference is

strengthened by the fact that, during the Relevant Period, Plaintiffs repeatedly used

Vivendi in presentations to shareholders and actual and prospective customers as

an illustration of a company whose securities traded at a substantial discount to its

PMV.[53]

      Based on his calculation of Vivendi's PMV, and the spread between

that PMV and the market price of Vivendi securities, Rittenberry consistently gave

a "buy" or "hold" recommendation on Vivendi securities during the Relevant

Period.[54]  Rittenberry was aware of the liquidity crisis at Vivendi in 2002, but, by

---

[50]    *See* DX X (2001 print-out of Rittenberry spreadsheet calculating Vivendi's PMV, containing handwritten notes by Gabelli); 2/19/13 Tr. (Gabelli Redirect) at 229:19-230:2; 2/18/13 Tr. (Rittenberry Direct) at 61:2-21.

[51]    *See* 2/18/13 Tr. (Rittenberry Direct) at 63:2-20; DX K (4/5/01 e-mail from Rittenberry to Marc Gabelli and Vincent Roche).

[52]    *See* Woodson Dep. at 238:17-239:20.

[53]    *See* DX G, N, T.

[54]    *See* 2/18/13 Tr. (Rittenberry Direct) at 72:7-20; 83:23-24; 84:10-17.

reducing the market price for Vivendi ADS's without affecting its PMV, this crisis

only strengthened Rittenberry's "buy" or "hold" recommendation.[55]  Rittenberry's

"buy" or "hold" recommendation on Vivendi securities was further strengthened

by his view that the liquidity problems at Vivendi were a short-term concern,

which would not trouble a longer-term investor like Mario Gabelli.[56]

   I find that Rittenberry's conclusion that Vivendi's liquidity crisis was

a short-term concern that made it a more attractive investment, by reducing the

public market price of Vivendi securities without reducing its PMV, was shared by

the Gabelli Family, including Mario Gabelli.  On July 1, 2002,  Mario Gabelli

commented that Vivendi had "a wonderful array of assets," and that "Vivendi is a

good business[;]" on June 25, 2007,  Gabelli testified that his "view of [Vivendi's]

assets has not changed;"[57] and at the trial, he testified that he is "still buying"

---

[55] *See id*. (Rittenberry Direct) at 85:10-86:10; *id*. (Cross-Examination of Rittenberry) at 90:17-21 ("The Court: If the price was inflated and you stripped that inflation out, the market value would be even lower and the discount would be bigger, between the private market and the market price, right?  The Witness: Yes.").  *See also* DX AB (2/1/01 e-mail from Rittenberry to Ken Egusa, analyst at Gabelli & Co. tasked with analyzing certain Japanese companies) (indicating that Rittenberry was aware that Vivendi had liquidity issues).

[56] *See* 2/18/13 Tr. (Rittenberry Direct) at 86:11-87:1 (testifying that Mario Gabelli is a long-term investor, and that, during the Relevant Period, he believed that the liquidity problems at Vivendi were a short-term problem).

[57] 6/25/07 Deposition of Mario Gabelli at 190:22-194:23.

Vivendi securities.[58]  Further, "the intrinsic value [of a company] from the perspective of GAMCO and the [M]utual [F]und [P]laintiffs is represented by their calculations of [PMV][,]"[59] and only Rittenberry calculated Vivendi's PMV during the Relevant Period.

Consistent with Rittenberry's recommendations and calculation of Vivendi's PMV, Plaintiffs doubled or tripled their holdings in Vivendi ADS's during the Corrective Disclosure Period.[60]  Plaintiffs have argued that these post-disclosure purchases were driven by Vivendi's hiring of a new CEO, Jean–René Fourtou.[61]  This argument has no basis in the record: no witness credibly testified in support of it; there is no discernible relationship between Plaintiffs' transactions and Fourtou's appointment as CEO on July 4, 2002; and Fourtou's appointment is not discussed in a contemporaneous record of Rittenberry's recommendations as to

---

[58]     2/19/13 Tr. (Gabelli Redirect) at 223:6.

[59]     *Id*. (Jamieson Direct) at 119:22-25.  *Accord id*. at 128:17-129:23 (testifying that GAMCO and the Mutual Fund Plaintiffs used PMV, supplemented by earnings per share and free and clear cash flow, to make investment decisions); *id*. (Alpert Direct) at 134:23-135:20 (verifying that the Mutual Fund Plaintiffs and GAMCO utilized the spread between PMV and market price to make investment decisions).

[60]     *See* JPTO at 7-11.

[61]     *See* 2/18/13 Tr. (Plaintiffs' Opening Argument) at 10:6-10.

Vivendi.[62]

Plaintiffs' Corrective Disclosure Period purchases of Vivendi ADS's reinforce my finding that Vivendi's liquidity crisis was irrelevant to Plaintiffs' decision to purchase Vivendi securities during the Relevant Period. One example is particularly telling. On July 1, 2002, Moody's downgraded Vivendi to junk status; the next day, Standard & Poor's downgraded Vivendi to one notch above junk status.[63] That same day, on July 2, 2002, Mario Gabelli caused Plaintiffs to purchase 312,000 Vivendi ADS's, despite having "learned about what happened at Vivendi with Messier [Vivendi's then-CEO] and the challenges with regards to what he said publicly on liquidity . . . ."[64]

In sum, I find that, throughout the Relevant Period: (1) Plaintiffs were value-based investors who utilized a propriety metric known as PMV to evaluate the intrinsic value of Vivendi securities; (2) the calculation of PMV relied upon by Plaintiffs to evaluate Vivendi was significantly higher than Vivendi's market price; (3) the market price of Vivendi securities factored into Plaintiffs' investment decision only as a comparator with PMV; and (4) the liquidity crisis at Vivendi

---

[62]     *See* DX V (8/20/02 GBL Morning Meeting Notes) at 0003.

[63]     *In re Vivendi Universal, S.A. Sec. Litig.*, 634 F. Supp. 2d 352, 358 (S.D.N.Y. 2009).

[64]     2/19/13 Tr. (Gabelli Redirect) at 222:23-25.

was irrelevant to Plaintiffs' investment decisions, except to the extent that each

corrective disclosure made Vivendi a more attractive investment, by increasing the

spread between Vivendi's PMV and its market price.

## II.    APPLICABLE LAW

### A.    The Fraud on the Market Presumption Under Section 10(b)

"[R]eliance upon [a] misrepresentation or omission" is an element of a

private securities fraud claim brought under Section 10(b) and Securities and

Exchange Commission Rule 10b–5.[65]  To prove reliance, the plaintiff must show

that *but for* the misstatement or omission, she would not have transacted in the

security.[66]  "The traditional (and most direct) way a plaintiff can demonstrate

reliance is by showing that he was aware of a company's statement and engaged in

a relevant transaction — *e.g.*, purchasing common stock — based on that specific

---

[65]    *Ashland Inc. v. Morgan Stanley & Co., Inc.*, 652 F.3d 333, 337 (2d
Cir. 2011) (quoting *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552
U.S. 148, 157 (2008)).  *Accord Erica P. John Fund, Inc. v. Halliburton Co.*, —
U.S. — , 131 S.Ct. 2179, 2184 (2011).

[66]    *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 106 (2d
Cir. 2007) ("Transaction causation [*i.e.* reliance] only requires allegations that but
for the claimed misrepresentations or omissions, the plaintiff would not have
entered into the detrimental securities transaction.") (quotation marks and citations
omitted).  *Cf. Stoneridge Inv. Partners, LLC*, 552 U.S. at 160 ("[R]eliance is tied to
causation, leading to the inquiry whether respondents' acts were immediate or
remote to the injury").

misrepresentation."[67]

In *Basic v. Levinson* the Supreme Court held that an investor who bought or sold securities in an efficient market may avail herself of the presumption that she "relied on the integrity of the price set by the market . . . ."[68] The Court reasoned that "[b]ecause most publicly available information is reflected in [the] market price, an investor's reliance on any public material misrepresentations, therefore, may be presumed for purposes of a Rule 10b-5 action."[69]  As long as the "plaintiffs can show that the alleged misrepresentation was material and publicly transmitted into a well-developed market, then reliance will be presumed . . . ."[70]

The fraud on the market presumption announced in *Basic* allowed plaintiffs to proceed with securities fraud claims without having to show that they were personally aware of, and relied on, a company's misrepresentations.  Through

---

[67]     *Erica P. John Fund, Inc.*, 131 S.Ct. at 2185.

[68]     485 U.S. 224, 227 (1988).  Similarly, reliance on omissions may be presumed when the omissions are material and the issuer had a duty to disclose. *See Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153-54 (1972).

[69]     *Basic*, 485 U.S. at 247.  *Accord Hevesi v. Citigroup Inc.*, 366 F.3d 70, 77 (2d Cir. 2004).

[70]     *In re Salomon Analyst Metromedia Litig.*, 544 F.3d 474, 483 (2d Cir. 2008).

this rule, the Supreme Court sought to alleviate the difficult evidentiary issues and

problems with class certification that commonly arise in securities fraud actions.[71]

However, because the purpose of federal securities law is "not to provide investors

with broad insurance against market losses, but to protect them against those

economic losses that misrepresentations actually cause[,]" the fraud on the market

theory of reliance was made rebuttable.[72]

      The Second Circuit has consistently stated that "[t]he . . .

fraud-on-the-market theory involves two rebuttable presumptions that permit a

finding of . . . reliance . . . : 'that (1) misrepresentations by an issuer affect the price

of securities traded in the open market, and (2) investors rely on the market price of

securities as an accurate measure of their intrinsic value.'"[73]  This formulation

---

[71]    *See Erica P. John Fund, Inc.*, 131 S.Ct. at 2185 (noting that the holding of *Basic* was made in response to the evidentiary issues posed by modern impersonal markets, as well as the difficulty of class certification where direct proof of reliance was required).

[72]    *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 345 (2005) (citing *Basic*, 485 U.S. at 251-52 (White, J., joined by O'Connor, J., concurring in part and dissenting in part) ("A nonrebuttable presumption of reliance – or even worse, allowing recovery in the face of affirmative evidence of nonreliance, – would effectively convert Rule 10b-5 into a scheme of investor's insurance.") (quotation marks and citations omitted)).

[73]    *In re Am. Int'l Grp., Inc. Sec. Litig.*, 689 F.3d 229, 234 n.3 (2d Cir. 2012) (quoting *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*,  546 F.3d 196, 200 n.4 (2d Cir. 2008) (quoting *Hevesi*, 366 F.3d at 77)).

flows directly from *Basic* itself, which supports its holding with a line of cases that analogize the efficient market price of a security to an investor's "'unpaid agent,'" who performs the role that the investor would play in a face-to-face transaction, "'informing him that given all the information available to it, the value of the stock is worth the market price.'"[74]

In order to invoke the fraud on the market presumption, "plaintiffs must demonstrate that the alleged misrepresentations were publicly known[,] . . . that the stock traded in an efficient market, and that the relevant transaction took place between the time the misrepresentations were made and the time the truth was revealed."[75]  If the plaintiff makes this showing, the burden shifts to the defendant to rebut the presumption of reliance.[76]

---

[74]   *Basic*, 485 U.S. at 244 (quoting *In re LTV Sec. Litig.*, 88 F.R.D. 134, 143 (N.D. Tex. 1980)).  The court in *In re LTV Securities Litigation* goes on to state that: "If the investor did not rely on such agent, there has been no reliance. Thus a defendant should be able to attack such an investor's claim in much the same way he would in a face-to-face transaction — being allowed to offer proof that the reliance was upon matters extraneous to the market (to rebut the presumption)." 88 F.R.D. at 143-44.

[75]   *Erica P. John Fund, Inc.*, 131 S.Ct. at 2185 (quotation marks and citations omitted).

[76]   Until recently, plaintiffs in this Circuit also had to show materiality in order to proceed with a class action on a fraud on the market theory.  *See In re Salomon Analyst Metromedia Litig.*, 544 F.3d at 481.  A misstatement is material when "there [is][] a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered

*Basic* states that: "[a]ny showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or [her] decision to trade at a fair market price, will be sufficient to rebut the presumption of reliance."[77]  In addition to stating this general rule, *Basic* also provides two examples of circumstances where the presumption may be rebutted: (1) when the falsity of the misstatements is already known to the market, such that there is no price impact; and (2) when the investor would have transacted in the security regardless of what was known or not known about the issuer or its stock.[78]

The first example — sometimes termed "truth on the market" — could be classified as a mode of negating fraud entirely, rather than rebutting the fraud on the market theory.[79]  Similarly, a showing that the market in question was

---

the total mix of information made available."  *Basic*, 485 U.S. at 231–32 (quotation marks and citations omitted).  Today, the Supreme Court decided *Amgen Inc. v. Connecticut Ret. Plans and Trust Funds*, which holds that proof of materiality is not a precondition to class certification.  No. 11–1085, 568 U.S. —, 2013 WL 691001 (Feb. 27, 2012).

[77]    *Basic*, 485 U.S. at 248.

[78]    *See id*.

[79]    *See* Daniel R. Fischel, *Efficient Capital Markets, the Crash, and the Fraud on the Market Theory*, 74 CORNELL L. REV. 907, 918-19 (1988) ("In the first situation where the market price is not artificially inflated because the truth becomes known from other sources, it is inaccurate to suggest that the presumption of reliance is rebutted.  In fact, the example has nothing to do with reliance. Investors do not rely any less on the market price because that price has not been artificially inflated.  It would be more accurate to characterize this situation as one

not efficient does not really 'rebut' the presumption, but rather shows that it does

not apply in the first place: reliance on the price set by an efficient market is

impossible when the market is not efficient.[80]  These arguments — *i.e.*, truth on the

market and market inefficiency — are susceptible to proof on a class-wide basis.[81]

     True rebuttals of the presumption —  *i.e.*, arguments that the investors

in question did not in fact "rely on the market price of securities as an accurate

measure of their intrinsic value"[82] — often "require an individualized inquiry into

the buying and selling decisions of particular class members[,]"[83] and as such are

less susceptible to proof on a class-wide basis.  In short, a class may be certified

despite the presence of members who allegedly did not rely on the integrity of the

---

where no fraud on the market occurred.").

    [80]    *Cf.  In re Initial Public Offerings* ("*IPO*") *Sec. Litig.*, 471 F.3d 24, 42 (2d Cir. 2006).

    [81]    *See In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d at 584. *Cf. Amgen Inc. et al.*, No. 11–1085, 568 U.S. —, 2013 WL 691001, slip op. at 17 ("Materiality thus differs from the market-efficiency and publicity predicates in this critical respect: While the failure of common, classwide proof on the issues of market efficiency and publicity leaves open the prospect of individualized proof of reliance, the failure of common proof on the issue of materiality ends the case for the class and for all individuals alleged to compose the class.").

    [82]    *In re Am. Int'l Grp., Inc. Sec. Litig.*, 689 F.3d at 234 n.3 (quotation marks and citations omitted).

    [83]    *In re Vivendi Universal, S.A. Sec. Litig.*,  765 F. Supp. 2d at 584.

market.[84]  When this occurs, questions of individual reliance will call for

individualized proof, which may be taken at separate trials after the class-wide trial

has completed.[85]

This case turns entirely on whether Vivendi has successfully rebutted

Plaintiffs' reliance on the misrepresentations and omissions that were incorporated

into the market price of Vivendi ADS's.  In addressing how individual reliance

may be rebutted, the *Basic* court explained:

> Petitioners also could rebut the presumption of reliance as to
> plaintiffs who would have divested themselves of their Basic
> shares without relying on the integrity of the market.   For
> example, a plaintiff who believed that Basic's statements [falsely
> disclaiming the possibility of a merger] were false and that Basic
> was indeed engaged in merger discussions, and who consequently
> believed that Basic stock was artificially underpriced, but sold his
> shares nevertheless because of other unrelated concerns, *e.g.*,

---

[84]     *See, e.g.*, *In re Lehman Bros. Sec. & ERISA Litig.*, No. 08 Civ. 5523,
2013 WL 440622, at *2 (S.D.N.Y. Jan. 23, 2013) ("Tracking an index for an
efficient market is sufficient reliance for the purpose of class certification")
(citations omitted); *In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. 267, 282
(S.D.N.Y. 2003) (rejecting argument that institutional investor named plaintiffs
were atypical and subject to unique defenses, because "[m]aking careful
investment decisions does not disqualify an investor from representing a class of
defrauded investors or from relying on the presumption of reliance").  *Cf. Maywalt
v. Parker & Parsley Petroleum Co.*, 147 F.R.D. 51, 54 (S.D.N.Y. 1993) ("[T]he
Second Circuit has directed district courts to apply Rule 23 according to a liberal
rather than a restrictive interpretation and has explicitly noted its preference for
class certification in securities cases.") (citations omitted).

[85]     *See In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d at 584-
85 (collecting cases).

> potential antitrust problems, or political pressures to divest from shares of certain businesses, could not be said to have relied on the integrity of a price he knew had been manipulated.[86]

This quote illustrates that the fraud on the market presumption is rebuttable when the plaintiff traded "without relying on the integrity of the market."[87]  Equivalently, in the Second Circuit's formulation, the presumption is rebutted if the plaintiff did not "rely on the market price of [the] securit[y] as an accurate measure of [its] intrinsic value."[88]

## III.   CONCLUSIONS OF LAW

Even before *Basic*, one court held that "given the force of the [fraud on the market] presumption (carrying a burden of proving a purchase would have been made even if the truth were known)[,]" attempts to rebut the presumption "would likely be futile in the vast number of cases."[89]  In part, this is because "[t]he finding of materiality by its very nature establishes that the information omitted would have been considered important by investors generally.  It thus will be only the unusual case in which compatible findings of materiality and nonreliance can

---

[86]     *Basic*, 485 U.S. at 249.

[87]     *Id*.

[88]     *In re Am. Int'l Grp., Inc. Sec. Litig.*, 689 F.3d at 234 n.3  (quotation marks omitted).

[89]     *In re LTV Sec. Litig.*, 88 F.R.D. at 143.

be made."[90] And much of the force of Justice White's dissent in *Basic* springs from his concern that the majority's opinion "allows investors to recover who can show little more than that they sold stock at a lower price than what might have been[,]" because "in practice . . . rebuttal is virtually impossible in all but the most extraordinary case."[91]

Based on the findings of fact set forth above, I conclude that this is just such an extraordinary case. As the Supreme Court recently explained, the fraud on the market presumption of reliance arises because, in an efficient market:

> [I]t is reasonable to presume that most investors — knowing that they have little hope of outperforming the market in the long run based solely on their analysis of publicly available information — will rely on the security's market price as an unbiased assessment of the security's value in light of all public information. Thus, courts may presume that investors trading in efficient markets indirectly rely on public, material misrepresentations through their reliance on the integrity of the price set by the market.[92]

The Supreme Court has also stated that: "[r]eliance . . . upon the defendant's deceptive acts is an essential element of the § 10(b) private cause of action . . .

---

[90]    *duPont v. Brady*, 828 F.2d 75, 78 (2d Cir. 1987) (discussing the *Affiliated Ute* presumption).

[91]    *Basic*, 485 U.S. at 256 & n.7 (White, J., joined by O'Connor, J., concurring in part and dissenting in part) (citations omitted).

[92]    *Amgen Inc. et al.*, No. 11–1085, 568 U.S. —, 2013 WL 691001, slip op. at 5.

because proof of reliance ensures that there is a proper connection between a

defendant's misrepresentation and a plaintiff's injury."[93]  To prove reliance, the

plaintiff must show that "but for the claimed misrepresentations or omissions, [she]

would not have entered into the detrimental securities transaction."[94]  Here,

Plaintiffs did not rely on the inflated market price of Vivendi ADS's as an

"unbiased assessment of [their] value[.]"[95]  By the same token, it cannot be said

that but for Vivendi's misstatements and omissions about its liquidity condition,

Plaintiffs would not have transacted in Vivendi ADS's.

    Quite the contrary: PMV, the metric that Plaintiffs used to determine

the intrinsic value of Vivendi ADS's, is completely independent of liquidity

concerns and market price.  There is no indication in the record that Plaintiffs

would have viewed Vivendi as a less attractive investment if Vivendi had fully

disclosed its liquidity condition at all relevant times.  In fact, in this counterfactual

scenario, because Plaintiffs' estimation of Vivendi's "intrinsic value" — as

measured by PMV — would be unchanged, and, through the irrational whims of

---

[93]    *Erica P. John Fund, Inc.*, 131 S.Ct. at 2184 (quotation marks and citations omitted).

[94]    *ATSI Commc'ns, Inc.*, 493 F.3d at 106 (quotation marks and citations omitted).

[95]    *Id.*

"Mr. Market," the price of Vivendi ADS's would have been lower, Plaintiffs would have seen Vivendi as a *more* attractive investment.  And they did: during the Corrective Disclosure Period, Plaintiffs doubled or tripled their holdings in Vivendi securities.

In other words, but for the alleged misrepresentations and omissions, Plaintiffs would have been *more* likely to invest in Vivendi.  Accordingly, it is more likely than not that during the Relevant Period, Plaintiffs did not "rely on the market price of [Vivendi] securities as an accurate measure of their intrinsic value.'"[96]  Vivendi has therefore carried its burden and rebutted the fraud on the market presumption.

This holding is sharply limited to its unusual facts, and should not be taken to suggest that sophisticated institutional investors or value-based investors are not entitled to the fraud on the market presumption in general.  As courts in this Circuit have routinely held, the use of sophisticated investment models does not foreclose a finding of material reliance on market price.[97]  Similarly, one can imagine a case where an investor, like the Plaintiffs here, used the market price of a security merely as a comparator with a private method of valuation, but in which

---

[96]    *In re Am. Int'l Grp., Inc. Sec. Litig.*, 689 F.3d 229, 234 n.3 (2d Cir. 2012) (quotation marks and citations omitted).

[97]    *See, e.g., In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. at 281.

the fraud on the market presumption could not fairly be rebutted, because, but for the material misstatements, that investor would not have transacted in the securities at issue.

Because few securities cases proceed to trial — and fewer still are bench trials — there are few precedents addressing the narrow issue presented here.  The closest case on point appears to be *Black v. Finantra Capital, Inc.*[98]  In *Black*, the trial court charged the jury that plaintiff Herbert Black, who purchased restricted securities that could not be sold for several months in a private-market transaction, was entitled to the presumption that he relied on the market price of those securities, because the private-sale price was pegged to the public market price.[99]  After the jury returned a verdict for Black, the trial court entered judgment as a matter of law for the defendant, stating that "close review of the transcript now convinces the Court that defendants proved, out of Black's own mouth, the absence of reliance, in a way that no reasonable juror could dispute."[100]

The Second Circuit reversed, holding that:

The jury was free to weigh all the testimony, and either to

---

[98]   418 F.3d 203 (2d Cir. 2005).

[99]   *See id.* at 208.

[100]   *Black v. Finantra Capital, Inc.*,  286 F. Supp. 2d 339, 342 (S.D.N.Y. 2003).

discredit it or to accept a different interpretation of Black's testimony that the current market price was "not really relevant when you can't sell the stock for six months or three months," (Tr. at 104.), or to credit Black's testimony that he took market price into account, because, not surprisingly, the current market price was what determined whether he was "making a good deal." (Tr. at 50.) The fact that Black also took other considerations, such as Finantra's future prospects, its business plan, and his trust in the people soliciting his investment, into account in making his investment decision does not foreclose a finding of material reliance upon market price.[101]

The statement that the jury could have properly found reliance on the basis that the current market price determined whether Black was "making a good deal" could be taken to suggest that, once it attaches, the fraud on the market presumption is irrebuttable as against *any* plaintiff who buys a security at market price. This reading is overly broad: had the Second Circuit intended to announce such a sweeping principle, it would have done so. *Basic* plainly allows for the presumption to be rebutted when the plaintiff would have transacted in the security regardless of market price,[102] and the court in *Black* was undertaking an inquiry into whether the plaintiff had "material[ly] reli[ed] upon market price." A better reading of the passage, then, is that the Second Circuit was merely holding that the jury could have properly found that, but for the market price's inflation due to

---

[101]   *Black*, 418 F.3d at 209-10.

[102]   *See Basic*, 485 U.S. at 249.

fraud, the plaintiff would not have invested in the securities at issue.

Unlike Herbert Black, the Plaintiffs did not materially rely on market price in making their investment decision. Instead, as detailed above, had Vivendi's fraud been known to the market, the Plaintiffs would have been all the more eager to invest — which indeed they did, throughout the Corrective Disclosure Period. Adopting Vivendi's useful formulation of the transaction causation test, the market price of Vivendi ADS's was not the "motivating driving force" behind Plaintiffs' investment decision.[103]

During closing, counsel for Plaintiffs repeatedly stated that Plaintiffs had "relied on price."[104] Relatedly, in their trial memorandum Plaintiffs argued that, in order to rebut the presumption, Vivendi must show that "Plaintiffs would have purchased Vivendi securities in the same transactions and at the same prices that they did during the Relevant Period had they known that Vivendi and its management were engaging in an ongoing fraud."[105]

Plaintiffs support their "same price" argument with citations to two

---

[103]   2/19/13 Tr. (Vivendi's Closing Argument) at 261:7.

[104]   *Id*. (Plaintiffs' Closing Argument) at 244:6-7 ("Mr. Cappucci: I understand that. And what I'm saying is that they relied on price. They relied on price.").

[105]   2/11/13 Plaintiffs' Trial Memorandum of Law ("Pl. Mem.") at 6.

District Court cases from this Circuit.[106]   A careful reading of these cases reveals
that they do not announce a general principle, but rather explain that one
circumstance where the presumption may be rebutted is when the plaintiff would
have traded at the same price despite knowing of the material misstatements.
Further, both cases cite a Second Circuit case, *Kline v. Wolf*, which merely holds
that the presumption of reliance may be rebutted when "even if [plaintiff] had
known of the alleged misrepresentation, [she] would still have purchased the
stock."[107]   In short, these cases stand for the proposition that a plaintiff's
willingness to trade at the same price, even knowing of the fraud, is *one way* that
the presumption may be rebutted, not for the proposition that it is the *only* way.

Plaintiffs have also argued that the fact that Plaintiffs based their
evaluation of Vivendi ADS's on PMV "'should not defeat the fraud-on-the-market
presumption absent convincing proof that price played *no* part whatsoever in their

---

[106]   *See id.* at 7 (citing *Darquea v. Jarden Corp.*, No. 06 Civ. 722, 2008
WL 622811, at *4 (S.D.N.Y. Mar. 6, 2008) (The "presumption of reliance can be
rebutted, for example, if defendant can show that plaintiff would have purchased
the stock at the same price even if he had known the non-disclosed information.");
*Lawrence v. Philip Morris Cos., Inc.*, No. 94 Civ. 1494, 1999 WL 51845, at *4
(E.D.N.Y. Jan. 9, 1997) ("[I]f defendant can show that plaintiff would have
purchased the stock at the same price even if he had [] known the non-disclosed
information, defendant will successfully rebut the 'market reliance' presumption
and escape liability.")).

[107]   702 F.2d 400, 403 (2d Cir. 1983).

decision making' process."[108]   Because price will play a part in virtually all

investment decisions, this standard would effectively convert the fraud on the

market theory into an *irrebuttable* presumption.   The standard proposed by

Plaintiffs might be appropriate for class certification — the posture in which the *In*

*re Initial Public Offering* decision was made.   It cannot, however, be applied at the

merits stage, as this would ignore the holding of *Basic* that "*[a]ny showing* that

severs the link between the alleged misrepresentation and *either* the price received

(or paid) by the plaintiff, *or [her] decision to trade at a fair market price*, will be

sufficient to rebut the presumption of reliance."[109]

   During closing argument, I raised my concern that Plaintiffs were

describing an *irrebuttable* presumption, and asked Plaintiffs' counsel how, in his

view, the fraud on the market presumption could be rebutted.[110]   His response

treated two of the examples given in *Basic* — truth on the market, and instances

where corrective non-public information is known to the plaintiff — as the only

ways that the fraud on the market presumption could be rebutted.[111]

---

[108]   Pl. Mem. at 8 (quoting *In re IPO Sec. Litig.*, 227 F.R.D. 65, 109 (S.D.N.Y. 2004) (emphasis in the original), *vacated and remanded*, 471 F.3d 24 (2d Cir. 2006)).

[109]   *Basic*, 485 U.S. at 248 (emphasis added).

[110]   *See* 2/19/13 Tr. (Plaintiffs' Closing Argument) at 235:16-236:7.

[111]   *See id.* at 235:16-237:10.

34

Contrary to Plaintiffs' view, the examples given in Basic were not meant to be exhaustive.  *Basic* holds that "*[a]ny* showing that severs the link between the alleged misrepresentation and . . . the plaintiff['s] . . . decision to trade at a fair market price, will be sufficient to rebut the presumption of reliance."[112] In light of this holding, defendants must be permitted to attempt to rebut the presumption by showing that plaintiffs would have transacted in securities notwithstanding any inflation in their market price caused by fraud.  A successful rebuttal of this sort will be exceedingly rare.  But it must be allowed here, lest the securities laws slip the restraints of causation entirely and become a judicially created investor insurance scheme.[113]

## IV.   CONCLUSION

Based on the findings of fact and conclusions of law stated above, I hold that Vivendi has rebutted the fraud on the market presumption of reliance. The Clerk of the Court is directed to enter judgment in Vivendi's favor and close this case.

---

[112]   *Basic*, 485 U.S. at 248 (emphasis added).

[113]   *Cf. Dura Pharm., Inc.*, 544 U.S. at 345.

SO ORDERED:

_____
Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            February 27, 2013

**-Appearances-**

**For Plaintiffs:**

Vincent R. Cappucci, Esq.
Arthur V. Nealon, Esq.
Evan T. Raciti, Esq.
Entwistle & Cappucci LLP
280 Park Avenue, 26th Floor West
New York, New York 10017
(212) 894-7200

**For Defendant Vivendi, S.A.:**

Paul C. Saunders, Esq.
Timothy G. Cameron, Esq.
Margot A. Miller, Esq.
Cravath, Swaine & Moore LLP
825 Eighth Avenue
New York, New York 10019
(212) 474-1000